## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>UINTAH VALLEY SHOSHONE TRIBE;<br>DORA VAN; RAMONA HARRIS; LEO<br>LEBARON & OTHERS WHO ARE IN<br>ACTIVE CONCERT WITH THE<br>FOREGOING,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Civil No. 2:17-cv-1140-BSJ<br><br>The Honorable Bruce S. Jenkins |

Plaintiff's Motion for Summary Judgment[1] and Defendants' competing Motion for Summary Judgment[2] came before the Court on June 1, 2018,[3] Jared C. Bennet appearing on behalf of Plaintiff United States of America, ("United States") and Michael J. Rock appearing on behalf of an organization called the Uintah Valley Shoshone Tribe, ("UVST") as well as individual Defendants Dora Van, Ramona Harris, and Leo LeBaron. The parties filed cross-motions for summary judgment on April 30, 2018, there being no genuine contest as to material facts. Plaintiff United States of America seeks, among other things, to permanently enjoin Defendants from selling and issuing hunting and fishing permits for use on state, federal, or tribal lands of the Ute Indian Tribe of the Uintah and Ouray Reservation ("Ute Tribe"). The sale of such licenses allegedly violates 18 U.S.C. § 1343, a criminal statute, which provides the following:

---

[1] Plaintiff's Motion for Summary Judgment, Dkt. No. 45.
[2] Defendants' First Motion for Summary Judgment, Dkt. No. 46.
[3] Motion Hearing, Dkt. No. 52.

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

At the June 1, 2018 hearing the Court heard oral arguments on the motions and reserved judgment. Having considered the parties' briefs, the undisputed evidence, the oral arguments of counsel, the relevant law, and the full record in this matter, the Court has determined that Plaintiff's motion for relief by way of an injunction should be DENIED, but otherwise should be GRANTED, and Defendants' cross-motion should be DENIED.

## *Factual Background*

The material facts in this case are undisputed. The UVST, the Defendant, is not a tribe currently recognized by the United States. It is currently an organization composed of "Mixed-Bloods"[4] (and their descendants) who were formerly members of the Ute Tribe, but whose membership therein and relationship to the federal government was terminated under the Ute Partition and Termination Act of 1954 ("UPTA"). Three UVST "tribal leaders" are named as Defendants in Plaintiff's complaint; Dora Van, the chairwoman of the UVST, Ramona Harris, director of the UVST, and Leo LeBaron, director for wildlife of the UVST's wildlife department.

Defendants have been issuing hunting and fishing licenses purportedly authorizing the recipients to take certain wildlife from "lands within the original confines of the Uintah and

---

[4] "Mixed-Blood" is the term employed by a key federal statute implicated in Plaintiff's claim. *See* 25 U.S.C. § 677.

2

Ouray Reservation as set forth by Executive Orders of October 3, 1861, and January 5, 1882."[5] This area now, in contrast to at the time of original formation, includes a variety of land ownership, specifically state, federal, tribal, private and Ute Tribal Trust Lands. It is the position of the United States' that the authority to issue licenses on Tribal Trust Lands lies solely with the Ute Indian Fish and Wildlife Department, overseen by a joint committee of the Ute Tribal Business Committee and a designated representative of the Mixed-Bloods; and with respect to state and federal lands, and lands held in trust by the federal government, that the authority lies solely with the tribe, the federal government and the State of Utah. The United States claims the UVST has no authority to issue licenses for hunting and fishing on any of these lands. The United States asserts that by representing to permit purchasers that the UVST does have such authority, the UVST or its agents are engaging in fraud in violation of 18 U.S.C. § 1343. Defendants made use of interstate wire facilities in furtherance of their scheme to issue licenses, which Plaintiff argues justifies the issuance of a permanent injunction to prohibit them from issuing licenses in the future. 18 U.S.C. § 1345 authorizes a permanent injunction where the United States can establish that a person is violating or about to violate 18 U.S.C. § 1343. The Defendants agreed in open court to issue no licenses while this matter is pending.

Issuance of a permanent injunction under 18 U.S.C. § 1345 requires the United States to prove: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (quotations and citations

---

[5] Plaintiff's Motion for Summary Judgment, Dkt. No. 45, Statement of Undisputed Facts, 24-27.

omitted). The United States asserts each element justifying a permanent injunction is demonstrated by uncontested facts.

In response, Defendants admit selling licenses but claim authority to do so pursuant to "treaty rights" unaffected by the UPTA. They assert that because they do have the authority, the issuance of the licenses is not fraudulent and therefore they are not in violation of 18 U.S.C. § 1343. Ultimately, the merit of Plaintiff's claim hinges on what sovereign rights, if any, are held by the UVST in lands within the original confines of the Uintah and Ouray Reservation as set forth by the Executive Orders referenced above as modified by subsequent legislation and tribal action. A determination on this point requires the Court to examine the vacillating history of the federal government's treatment of historic tribal lands and tribal organizations as modified by congressional and tribal action.

## Historical Background

The present status of rights in Ute Tribal and Ute Trust Lands of the Uintah and Ouray Reservation result from a long history of federal government action. The original Uintah Valley Reservation was created in 1861 by President Abraham Lincoln. Executive Order of October 3, 1861 *reprinted in Ute Indian Tribe v. State of Utah,* 521 F.Supp. 1072, 1157 app. A (D.Utah 1981), *aff'd in part, rev'd in part,* 773 F.2d 1087 (10th Cir.1985), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). Through this Executive Order, President Lincoln approved a recommendation of the Secretary of the Interior that "the Uintah Valley, in the Territory of Utah, be set apart and reserved for the use and occupancy of Indian Tribes." *Uintah and White River Band of Ute Indians v. United States,* 152 F. Supp. 953, 954 (Ct. Cl. 1957), *quoting* 1 Kappler p. 900.

A few years after Lincoln issued the Executive Order of 1861, the Act of May 5, 1864, 13 Stat. 63, "authorized and required the Superintendent of Indian Affairs to bring together and settle in the Uintah Valley as many of the Indians of Utah Territory as might be found practicable. It said that the Uintah Valley 'is hereby set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same.'" *Uintah and White River Band of Ute Indians*, 152 F. Supp. at 954.

In 1865 a document known as the "Spanish Fork Treaty" was negotiated with numerous Indian groups in Utah "providing for their surrender of all their rights in land in that territory which was suitable for agricultural and mineral purposes, but reserving to the Indians for their exclusive use and occupation 'the entire valley of the Uintah River within Utah Territory'." *Id.* Although the "Spanish Fork Treaty" was never ratified by the United States Senate, "various individual Indians and groups of Utah Indians, from time to time after 1865, moved into the Uintah Valley... [T]he Indians so migrating into the reservation, as well as those already there before the reservation was established, and their descendants, became and have since been known as the Uintah Indians or Uintah Ute Indians...and became grantees" under the 1864 Act. *Id.* at 954-55. The members of the UVST are among those persons descending from these original groups in the Uintah Valley.[6]

Defendants cite the "Spanish Fork Treaty of 1865" in their Response to Plaintiff's Summary of Argument[7] as the source of their hunting and fishing rights. In their original motion Defendants rely on a different source, citing instead "the 1861 and 1882 treaties."[8] Regardless,

---

[6] Plaintiff's Motion for Summary Judgment, Dkt. No. 45, Appx. 59-65.

[7] Reply to Response to Motion, Dkt. No. 54.

[8] Defendants' Motion for Summary Judgment, Dkt. No. 46, p. 8. The Executive Orders of October 3, 1861 and of January 5, 1882 were Executive Orders rather than treaties. Regardless, the rights of Indians inhabiting the territory

with respect to the "Spanish Fork Treaty" it is enough to note that it was never ratified and thus had no legal effect. *Id.* at 954.

In 1882, President Chester A. Arthur authorized the creation of the Uncompahgre Reservation, upon which the Uncompahgre Utes were settled. Executive Order of January 5, 1882, *reprinted in Ute Indian Tribe v. State of Utah,* 521 F.Supp. 1072, 1164 app. A (D. Utah 1981). This reservation was not within the area of the Uintah Reservation. *Hackford v. Babbit,* 14 F.3d 1457, 1461 (10th Cir. 1994). From portions of both the Uncompahgre Reservation and the Uintah Valley Reservation, the Uintah and Ouray Reservation was formed. *See United States v. Van Murdock,* 132 F.3d 534, 540 (10th Cir. 1997).

As recounted by the Tenth Circuit in *Hackford,* under the Indian Reorganization Act of 1934 the Uintah, White River,[9] and Uncompahgre Bands of the Ute Tribe reorganized to form the "Ute Tribe of the Uintah and Ouray Reservation":

> In 1934, Congress...enacted the Indian Reorganization Act (IRA), ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. §§ 461–79). The IRA...recognized the right of tribes to draw up constitutions and corporate charters for self-governance...Pursuant to the IRA, the Uintah, White River, and Uncompahgre bands formed the Ute Indian Tribe of the Uintah and Ouray Reservation in 1937....

> Thereafter, in June 1950, representatives of the members of the Uncompahgre, White River, and Uintah Bands signed a series of five tribal resolutions which completed the transition, which began with the Constitution, from loosely-knit bands to unified Ute Tribe...Under the resolutions, the entire Tribe would share

---

pursuant to the Executive Orders and the related congressional acts follow as readily as they would from a treaty and are treated as such.

[9] The White River Band had moved to the Uintah Reservation pursuant to an agreement embodied in the Act of June 15, 1880, 21 Stat. 199.

equally in all tribally-held land, in any proceeds from such land, and in any claims for lands ceded to the United States which predated the formal creation of the Ute Indian Tribe without regard to band derivation.

*Hackford v. Babbitt*, 14 F.3d 1457, 1461 (10th Cir. 1994).

In Article VI, § 4 of the Constitution establishing the Ute Tribe, the allocation of powers previously held by the various independent bands and not otherwise provided for in the Constitution is addressed:

> Any rights and powers heretofore vested in the Tribe or bands of the Uintah and Ouray Reservation but not expressly referred to in this Constitution shall not be abridged by this article, but may be exercised by the people of the Uintah and Ouray Reservation through the adoption of appropriate By-laws and constitutional amendments.

Constitution and By-Laws of the Ute Indian Tribe of the Uintah and Ouray Reservation, Article VI, § 4.

The Constitution "thus makes clear that the Bands [occupying the Uintah and Ouray Reservations] ceased to exist separately outside the Ute Tribe [and] that jurisdiction over what was formerly the territory of the Uintah Band was to be exercised by the Ute Tribe, and that the rights formerly vested in the Uintah Band were to be defined by the Ute Constitution and exercised by the Ute Tribe." *United States v. Von Murdock*, 132 F.3d 534, 541 (10th Cir. 1997).

In June 1950, representatives of the members of the Uncompahgre, White River, and Uintah Bands signed, pursuant to the Tribal Constitution, a resolution determining that the entire unified Tribe would share equally in all tribally-held land:

> "IT IS FURTHER RESOLVED that the members of the Uncompahgre, White
> River and Uintah Bands of Ute Indians in the same meeting hereby compromise
> and settle all existing controversies between themselves as to the ownership of
> land within the Uintah and Ouray Reservation and income issuing therefrom, both
> heretofore and hereafter, by determining and agreeing that such land and income
> shall be the tribal property of all the Indians of the Ute Indian Tribe of the Uintah
> and Ouray Reservation without regard to band derivation."

Tribal Resolution No. 3 (Adopted June 1, 1950).

The foregoing makes clear that both jurisdiction and ownership over what was formerly the territory of the Uintah Band was transferred to the Ute Tribe by the Uintah Band. The transfers of authority and ownership made by the Uintah Band are important because the UVST self-identifies as the Uintah Band, and its claim of authority to issue licenses is based on rights historically acquired by the Uintah Band. A letter in the record from Defendant Dora Van to the Ute Tribe Business Committee makes it abundantly clear that the UVST, the Tribe of Affiliated Ute Citizens of Utah, and the Uintah Band are synonymous.[10] For example, she states that "[t]he Uintah Shoshone Tribe, (aka, Tribe of Affiliated Ute Citizens; aka, Uintah Band) whose members are one in the same (sic)…"[11] Likewise with the closing of her letter: "If you have any questions, please contact the Office of the Uintah Valley Shoshone Tribe…(aka, Uintah Band) at the above stated contact numbers. Sincerely, Dora Van, Chairwoman[.]"[12] The UVST claim authority to issue hunting and fishing licenses through their identity as the Uintah Band. The Uintah Band has no such authority.

---

[10] Plaintiff's Motion for Summary Judgment, Dkt. No. 45, Appx. 59-65.
[11] *Id.*, Appx. 61.
[12] *Id.*, Appx. 65.

Ute Tribe rights in the Ute Tribe Lands underwent further modification as a result of the Ute Partition and Termination Act ("UPTA") of August 27, 1954, ch. 1009, 68 Stat. 868 (codified as amended at 25 U.S.C. §§ 677–677aa). One of a series of Indian termination statutes Congress passed to reduce federal involvement in Indian affairs between 1954 and 1956, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 133 n. 1 (1972), the UPTA established a procedure to divide tribal assets between the Full-Blood members of the Ute Tribe and the Mixed-Bloods. Pub. L. No. 83-671, § 1; 68 Stat. 868. The UPTA "defined full-bloods as those tribal members possessing one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half a degree, [25 U.S.C. § 677a(b)], and defined mixed-bloods as those members who did not possess sufficient Ute or Indian blood to fall within the definition of full-bloods and those full-bloods who chose to be designated as mixed-bloods, *id.* § 677a(c)." *Von Murdock,* 132 F.3d at 535. The divisible assets were allocated between the two groups, while the non-divisible tribal assets "were to remain in government trust and be jointly managed by [the Ute] Tribal Business Committee and the Mixed-Bloods' representative.'" *Hackford,* 14 F.3d at 1462 (quoting *Ute Distrib. Corp. v. United States,* 938 F.2d 1157, 1159 (10th Cir. 1991)). Hunting and fishing rights were determined to be non-divisible assets, *United States v. Felter,* 752 F.2d 1505, 1509 (10th Cir. 1985), and thus held in trust by the United States and exclusively managed by the Ute Tribal Business Committee and the Mixed-Bloods' representative. *Von Murdock,* 132 F.3d 534, 536 (10th Cir. 1997).

The UVST were deemed Mixed-Bloods pursuant to the UPTA.[13] As Mixed-Bloods, they were involved in the organization of the Affiliated Ute Citizens, a group whose board was empowered "to act as their authorized representative" in the management of non-divisible assets.

[13] *Id.,* Statement of Undisputed Facts, ¶¶ 11-12; *Id.,* Appx. 62-64.

*Hackford*, 14 F.3d at 1462. The Mixed-Blood Representative and the Ute Tribal Business

Committee have together enacted by-laws that govern hunting and fishing rights on the Uintah

and Ouray Reservation,[14] and are provided in Ute Tribal Code §§ 8-8-1 to 8-1-24.[15]

Considering the effect of the Ute Tribal Constitution noted above, Defendants' argument

that the UVST's tribal[16] hunting and fishing rights survive the UPTA is without merit. Although

the UVST continues to maintain its own cultural identity, any tribal hunting and fishing rights

the UVST member's ancestors acquired through the Executive Orders of 1861 and 1881 (along

with related acts of Congress) were ceded to the unified Ute Tribe formed pursuant to the tribal

constitution established under the IRA; and their interest as former Ute Tribe members was later

entrusted to the Mixed-Blood representative pursuant to the UPTA. Accordingly, the UVST and

its Mixed-Blood members have no residual share in tribal hunting and fishing rights except as

exercised by their representative in conjunction with the Tribal Business Committee of the Ute

Tribe. The heritage of the UVST remains important to its members and continues to be

recognized culturally by many, but the Court is bound by the acts of Congress discussed above.

A change in circumstances and powers rests with Congress with its plenary power over Indian

tribes.

---

[14] *Id.*, Statement of Undisputed Facts, ¶ 15.
[15] These provisions create an expansive regulatory scheme intended to "provide for an orderly system on the Reservation for the management and control of wildlife and outdoor recreation resources of the Tribe on the Reservation." Ute Tribal Code § 8-8-1(1). Included are provisions declaring it unlawful for both tribal members and non-members to hunt or fish without a permit, *Id.* at § 8-1-24(10), establishing a Ute Indian Fish and Wildlife Department, *Id.* at § 8-1-4, and granting that department the power to license hunting and fishing and enforce the provisions of the Code. *Id.* at § 8-1-4(1).
[16] The authority to exercise jurisdiction over hunting and fishing in Ute Tribe Lands is distinct from the individual right of user. The right of user of individual Mixed-Bloods was addressed in *United States v. Felter*, 752 F.2d 1505 (10th Cir. 1985), and found to remain with the Mixed-Bloods who were alive during the enactment of the UPTA but not passing to their descendants.

*Legal Analysis for a Permanent Injunction Under 18 U.S.C. § 1345*

Having determined that the UVST or its officers do not have the authority to issue

hunting and fishing permits, it remains to be decided whether the permanent injunction sought by

the United States to prohibit Defendants from continuing to do so is warranted. As presented

above, the requirements for a permanent injunction under 18 U.S.C. § 1345 are: "(1) actual

success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened

injury outweighs the harm that the injunction may cause the opposing party; and (4) the

injunction, if issued, will not adversely affect the public interest." *Prairie Band Potawatomi*

*Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (quotations and citations omitted).

To satisfy the first element the United States must prove its wire fraud claim under 18

U.S.C. § 1343, which requires demonstrating: "(1) a scheme or artifice to defraud or obtain

money by false pretenses, representations, or promises; and (2) use of interstate wire

communications to facilitate that scheme." *United States v. Cochran*, 109 F.3d 660, 664 (10th

Cir. 1997). The United States argues that Defendants are engaged in a scheme to obtain money by

false representations and promises. Based on the agreed factual stipulations it is difficult for the

Court to find such a scheme to obtain money by false representations and promises through the sale

of licenses. The question presented to the Court by the United States is more in the nature of a

declaration as to the absence of sovereign power in Defendants to issue hunting and fishing licenses.

Thus, it appears to the Court the United States as trustee is entitled to a ruling so declaring, but

denied relief by way of injunction because of the absence of evidence dealing with a criminal statute.

It is clear from the history since Lincoln's time as a result of congressional and tribal action that

Defendants have no power to issue licenses to hunt and fish on trust or Tribal lands. None. They

should not do so, not because they have concocted a scheme to defraud purchasers of such licenses,

11

but because they simply lack power to issue such licenses. That resides elsewhere as determined above. It does not reside in Defendants.

## CONCLUSION

SO ORDERED. Let judgment be entered accordingly.

DATED this 5ᵗʰ day of September, 2018.

Bruce S. Jenkins
United States Senior District Judge